## IN THE UNITED STATES DISTRICT COURT FOR
## THE CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Steve Martin, Carol Tegard,<br>Denayer Artis, Allen Rose,<br>and Doug Hildebrand, as<br>representatives of a Class of<br>similarly situated persons, and on<br>behalf of the Plan, | )<br>)<br>)<br>)<br>)<br>) | |
| | ) | Case No. 07-1009 JBM/JAG |
| Plaintiffs, | )<br>) | |
| | ) | |
| v. | ) | Judge Joe Billy McDade |
| | ) | |
| | ) | Magistrate Judge John A. Gorman |
| Caterpillar, Inc., Benefit Funds | ) | |
| Committee of Caterpillar Inc., | ) | **JURY TRIAL** |
| Caterpillar Investment Management | ) | **DEMANDED ON ALL** |
| Ltd., | ) | **COUNTS AND ISSUES SO** |
| | ) | **TRIABLE** |
| Defendants. | ) | |

### SECOND AMENDED COMPLAINT FOR BREACH OF FIDUCIARY DUTY

1.      In this action, pursuant to ERISA § 502(a),  29 U.S.C. § 1132(a), Plaintiffs and

Class Representatives Steve Martin, Carol Tegard, Denayer Artis, Allen Rose and Doug

Hildebrand on behalf of the Caterpillar 401(k) Plan (the "Plan") and similarly situated

participants and beneficiaries in the Plan, seek to recover the losses suffered by the Plan, and to

obtain  injunctive and other equitable relief for the Plan, from Caterpillar Inc. ("Caterpillar"), the

Plan Sponsor, the Benefit Funds Committee of Caterpillar Inc. (the "Committee"), the Plan

Administrator, and other Defendants identified below (collectively "Defendants") based upon

breaches of their fiduciary duties.

2.      As set forth in detail below, Defendants caused the Plan to include investment

options with fees and expenses – paid by the Plan, and thus borne by Plan participants – that

were and are unreasonable and excessive; not incurred solely for the benefit of the Plan and its participants; and undisclosed to participants.  Defendants established a for-profit business to receive these excessive fees and otherwise to illegally profit from the Plan.  Further, as set forth below, Defendants' selection of investment options for the Plan was imprudent and improper in light of the Plan's size and enormous negotiating leverage in the investing marketplace.  By subjecting the Plan and its participants to these investment options and the accompanying excessive fees and expenses, and by other conduct set forth below, Defendants violated their fiduciary obligations under ERISA and caused damages to the Plan.

## PARTIES, JURISDICTION AND VENUE

### Plaintiffs:

3.      Plaintiff and Class Representative Steve Martin is a resident of Booneville, Missouri.

4.      Plaintiff and Class Representative Carol Tegard is a resident of Hanna City, Illinois.

5.      Plaintiff and Class Representative Denayer Artis is a resident of Peoria, Illinois.

6.      Plaintiff and Class Representative Allen Rose is a resident of Edwards, Illinois.

7.      Plaintiff and class Representative Doug Hildebrand is a resident of Brimfield, Illinois.

8.      Each Plaintiff and Class Representative is a participant in the Plan.

### Defendants:

9.      Defendant Caterpillar Inc. is a Delaware corporation with its headquarters in Peoria, Illinois and facilities located throughout the United States and around the world.

10.     Caterpillar is the Plan Sponsor and the Plan Administrator pursuant to ERISA § 3(16).

11.     Defendant Benefit Funds Committee (the "Committee") is a named fiduciary of the Plan.  The Committee is comprised of Caterpillar officers and employees and serves at the appointment and discretion of Caterpillar.

12.     Defendant Caterpillar Investment Management, Ltd. ("CIML") is a wholly-owned subsidiary of Caterpillar.  CIML manages the vast majority of Plan assets.

## Jurisdiction and Venue:

13.     Plaintiffs bring this action pursuant to ERISA §§ 502(a)(2) & (3), 29 U.S.C. § 1132(a)(2) & (3), which provide that participants may pursue civil actions on behalf of the Plan to remedy breaches of fiduciary duty as set forth in ERISA § 409, 29 U.S.C. § 1109,  and to obtain other appropriate equitable relief.  This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1)(2).

14.     All Defendants are subject to service of process issued from this Court pursuant to 29 U.S.C. § 1132(e)(1)(2).

15.     Venue is proper in this Court pursuant to 29 U.S.C. § 1132(e)(2).

## Rule 23 Requires Class Certification:

16.     Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the Plan, themselves and all similarly situated Plan participants and beneficiaries.  The Plan is comprised of a unitary trust corpus in which each Plaintiff, and each Plan participant, has an interest.  Plaintiffs seek to represent the following (the "Class"):

> All persons, *excluding the Defendants, and/or other individuals who are or may be liable for the conduct described in this Complaint,* who were or are participants or beneficiaries of the Plan and who were, are or may have

been affected by the conduct set forth in this Complaint, as well as those who will become participants or beneficiaries of the Plan in the future.

17. Certification of this Class is proper under Rule 23(a) in that:

A. **Numerosity.** The members of the Class are so numerous that joinder of all members is impracticable. Although the Plaintiffs do not know the exact number of Class members as of the date of filing, the Plan's public documents state that, at the end of the 2005 Plan year, there were 32,462 participants with account balances in the Plan.

B. **Commonality.** Common issues of fact and law predominate over any issues unique to individual Class members. Issues that are common to all Class Members include, but are not limited to, whether the Defendants:

    i. Engaged in a campaign of self-interested and prohibited transactions by establishing a for-profit company with Plan participants' retirement savings and reaping prohibited profits by doing so;

    ii. Included investment options in the Plan which were imprudent and improper in light of the Plan's size and negotiating leverage;

    iii. Included investment options that caused participants to consistently under-perform the market in long-term retirement savings;

    iv. Failed to understand, control, and/or capture for the benefit of the plan monies involved in revenue sharing and additional compensation streams.

v.   Violated their fiduciary duties by including retail mutual funds, closet index funds and/or other investment options inappropriate for the Plan in light of its size and bargaining power;

vi.   Caused the Plan to pay for active management that provided no benefit to the Plan or its participants;

vii.   Impaired participants' retirement savings by charging fees and holding cash in the Caterpillar Stock Fund;

viii.   Failed to consider and secure low cost investment options routinely available to 401(k) plans the size of the Plan;

ix.   Failed to capture profits available to the Plan because of its size from such activities as securities lending and use of float;

x.   Subjected the Plan to fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of Plan participants;

xi.   Failed to monitor the fees and expenses paid by the Plan;

xii.   Failed to inform themselves of, and understand, the various methods by which vendors in the 401(k), financial and retirement industry collect payments and other revenues from 401(k) plans;

xiii.   Failed to establish, implement, and follow procedures to properly and prudently determine whether the fees and expenses paid by the Plan were reasonable and incurred solely for the benefit of Plan participants;

xiv. Failed properly to inform, and/or disclose to, Plan participants the fees and expenses that are, or have been, paid by the Plan;

xv. Failed to inform, and/or disclose to, Plan participants in proper detail and clarity the transaction fees and expenses which affect participants' account balances in connection with the purchase or sale of interests in investment alternatives, and/or concealed material information regarding such matters;

xvi. Breached their fiduciary duties by failing to disclose that hidden and excessive fees were and are being assessed against Plan assets, and by failing to stop such hidden excessive fees;

xvii. In charging, causing to be charged or paid, and failing to monitor the fees and expenses of the Plan, failed to exercise the care, skill, prudence, and diligence that a prudent person would when acting in like capacity and familiar with such matters;

xviii. Caused and/or allowed fees and expenses to be paid by the Plan for purposes other than those allowed by ERISA;

xix. By the conduct above and/or by other conduct set forth in this Complaint, revealed in discovery and/or proven at trial, breached their fiduciary and other ERISA-imposed obligations to the Plan, Plan participants, and members of the Class;

xx. Are liable to the Plan and the Class for losses suffered as a result of the breaches of their fiduciary duties and other ERISA-imposed obligations; and

xxi.  Are responsible to account for the assets and transactions of the Plan and should be charged/surcharged for any transactions and payments for which they cannot account or which were not proper uses of Plan assets.

C.  **Typicality.** The Plan is comprised of a unitary trust corpus in which each Plaintiff, and each Plan participant, has an interest.  The claims brought by the Plaintiffs are typical of those of the absent Class members, in that:

i.  The Defendants owed the exact same fiduciary and other ERISA-based obligations to each Plan participant and beneficiary, and each member of the Class;

ii.  The Defendants' breach of those obligations constitutes a breach to each participant and beneficiary, and each member of the Class;

iii.  To the extent that there are any differences in Class members' damages, such differences would only arise after the Plan received plan-wide relief and would be a product of simple mathematics based upon account balances in the Plan.  Such minimal and formulaic differences are no impediment to class certification.

D.  **Adequacy of Representation.**  The Plaintiffs are adequate representatives of the absent Class members and will protect such absent Class members' interests in this litigation.  The Plaintiffs do not have any interests antagonistic to the other class members nor do they have any unique claims or defenses that might undermine the efficient resolution of the Class' claims.  Plaintiffs

have retained competent counsel, versed in ERISA, class actions, and complex litigation.

18.  Class certification is also appropriate under Rule 23(b) and each subpart in that:

A.  Pursuant to Rule 23(b)(1)(A), in the absence of certification, there is a risk of inconsistent adjudications with respect to individual class members;

B.  Pursuant to Rule 23(b)(2), as set forth above, the Defendants have acted on grounds generally applicable to the Class as a whole; and

C.  Pursuant to Rule 23(b)(3), as set forth above, common issues of law and fact predominate over any purely individual issues and thus a class action is superior to any other method for adjudicating these claims.

**FACTS**

**The Plan**

19.  The Plan is a "defined contribution plan," as defined in ERISA § 3(34), 29 U.S.C. § 1002(34), and contains or is part of an "eligible individual account plan" under ERISA § 407(d)(3)(A), 29 U.S.C. §1107(d)(3)(A) .  It is also a tax-qualified plan of the type popularly known as a "401(k) plan."

20.  Caterpillar has designed the Plan, combined with the other Caterpillar defined contribution plans, to be administered through a Master Trust (the "Master Trust").

21.  The Plan's assets comprise approximately 90 percent of the assets in the Master Trust.

22.  According to the Plan's financial statements filed with federal regulators:

A portion of the Plan's investments are in the Caterpillar Investment Trust (the "Master Trust"), which was established for the investment of the Plan and other Company

sponsored retirement plans. These plans pool their investments in the Master Trust in exchange for a percentage of participation in the Trust. The assets of the Master Trust are held by The Northern Trust Company (the "Trustee").

The percentage of the Plan's participation in the Master Trust was determined based on the December 31, 2005 and 2004 fair values of net assets, as accumulated by the Trustee for the investment fund options chosen by participants of each plan. At December 31, 2005 and 2004, the Plan's interest in the net assets of the Master Trust was 90.20 percent and 89.66 percent, respectively.

The Master Trust's investments are stated at fair value. Common stock is valued at quoted market prices. Shares of registered investment companies are valued at quoted market prices that represent the net asset value of shares held by the Master Trust at year-end. Common and collective trust investments are stated at unit value, which represents the fair value of the underlying investments.

The net investment income or loss of the Master Trust is reflected in the financial statements of the Plan based on the actual earnings of each investment fund as allocated to the Plan based on average investment balances throughout the year.

23.     According to the Plan's financial statements filed with federal regulators:

**Administration**

The Plan is administered by Caterpillar Inc., which is responsible for non-financial matters, and the Benefit Funds Committee of Caterpillar Inc., which is responsible for financial aspects of the Plan. Caterpillar Inc. and the Benefit Funds Committee have entered into a trust agreement with The Northern Trust Company (the "Trustee") to receive contributions, administer the assets of the Plan and distribute withdrawals pursuant to the Plan.

24.     According to the Plan's financial statements filed with federal regulators:

**Administrative Expenses**

Administrative costs, including trustee fees and certain investment costs, are paid by the Company.

25.     Defendants caused the Plan and the Master Trust to invest primarily in the

Preferred Group of Mutual Funds, which are owned and operated by CIML, Caterpillar's wholly

owned subsidiary.

9

26.     Caterpillar established CIML primarily with Plan assets, operated CIML for profit, and, in 2005, sold CIML for a profit.  Plan assets comprised the vast majority of CIML's assets under management.

27.     The Plan includes seventeen investment options ("Funds").   CIML managed these Funds for a profit.  Plan assets in these Funds were the majority of the assets under management that enabled Caterpillar to profitably sell CIML.

28.     Caterpillar has agreed to indemnify the Committee, individual employees, officers, members, and managers of the Committee and each Trustee for any and all liabilities and losses, costs or expenses of any kind or nature, except dishonesty, willful misconduct, or gross negligence.

## Defendants' Fiduciary Duties

29.     Defendants are bound by ERISA's imposition of a fiduciary duty that has been characterized as "the highest known to law."  Defendants' fiduciary obligations require that, at all times, they conduct themselves with the utmost good faith, loyalty and fidelity; act with the sole purpose of advancing the interests of the Plan, its participants and beneficiaries; scrupulously avoid all self-interest, duplicity and deceit; and fully disclose to, and inform participants and beneficiaries of, all material information.

30.     Defendants' fiduciary obligations under ERISA require that they exercise the care, skill and diligence which a prudent expert would in the operation of a Plan with like character and aims.

31.     Defendants' fiduciary obligations under ERISA require that they discharge their duties with the exclusive purpose of providing benefits to Plan participants and beneficiaries and defraying the reasonable cost of administering the Plan.

32.     Defendants' fiduciary obligations under ERISA require that they ensure, at all times, that Plan assets are *never* used for the benefit of the employer; here, Caterpillar.

33.     Defendants' fiduciary obligations under ERISA require them to scrupulously avoid any transaction in which Plan assets would by used by, or inure to the benefit of, a party in interest in connection with the Plan, including Caterpillar.

## DEFENDANTS' MULTIPLE BREACHES OF FIDUCIARY DUTY

### Self-Interested and Prohibited Transactions Resulting from the Plan's Payment of Unreasonable and Excessive Fees and Expenses

34.     Defendants have breached their fiduciary obligations by causing the Plan, and thus its participants and beneficiaries, to pay excess and unreasonable fees and expenses to Plan service providers.

35.     These excess payments took the form of both "Hard Dollar" payments (direct payments from the Plan to a service provider) and hidden Revenue Sharing transfers.

36.     In Revenue Sharing arrangements, Plan fiduciaries, like the Defendants here, select Funds which assess asset-based charges ("expense ratios") against Plan participants' retirement savings for the ostensible purpose of operating the Fund and managing Fund investments.  But in truth, such expense ratios include *both* fees collected for these ostensible purposes *and* excess fees assessments included in the expense ratio for the purpose of providing "soft dollars" for the Fund's Revenue Sharing program.

37.     Based upon the ostensible reasons for which Fund expense ratios are imposed, Plan participants investing in the Fund are led to expect and believe that the fees collected from their savings will benefit them by paying proper costs of operating the Fund and managing its investments.

38.     This, however, is false.  The Funds transfer the soft dollars collected via Revenue Sharing arrangements to other Plan service providers and/or others with some connection with the Fund or the Plan.

39.     As a result of Revenue Sharing arrangements, Plan service providers or others who do business with the Plan or the Fund received either or *both* a Hard Dollar payment from the plan *and* additional revenue that the Fund "shares" with them.

40.     The resulting fees and expenses borne by the Plan were unreasonable and excessive.

41.     In addition, these Revenue Sharing transfers, derived directly from Plan participants' retirement savings, are used to pay the Plan's administrative expense *even though Defendants expressly represented that "[a]dministrative costs, including trustee fees and certain investment costs, are paid by the Company."*

42.     Thus, not only are Plan participants forced to pay excessive and unreasonable fees and expenses, they are forced – through the Funds' hidden revenue sharing programs – to pay administrative expenses that Caterpillar is obligated to pay.

43.     Such payments are self-interested and prohibited transactions.  They are obvious and serious breaches of fiduciary duty.

### Caterpillar, Through CIML, Reaped Prohibited Profit From The Plan

44.     Caterpillar's various retirement plans, including the Plan, account for more than 70% of the dollars invested in the CIML Funds.  CIML initially created its Funds with Caterpillar employees' retirement assets.  CIML operated for years predominantly to provide, *for a profit* which went to the parent company Caterpillar, investment management and portfolio advisory services for Caterpillar retirement plans, including the Plan.

45.      The fees that CIML charged the Plan were unreasonable and excessive, especially in light of the more than $1.5 billion that the Master Trust (of which the Plan comprises 90%) invested with CIML.

46.      CIML has not managed these Funds itself.  Instead it has contracted with other investment managers –"sub-advisors" – to select a portfolio of stocks, bonds, and other securities for each Fund.  For these services, sub-advisors impose an additional layer of fees.

47.      These fees are subtracted from participants' Fund balances before returns are reported, and do not appear on participant statements.  As a result, the Plan and its participants unwittingly are forced to pay unnecessary and duplicative fees to CIML *and* to CIML's sub-advisors.

48.      In late 2005 or 2006, Caterpillar sold CIML to T. Rowe Price. Although Caterpillar used Caterpillar employees' retirement assets, including Plan assets, to establish CIML, and although such assets were the vast majority of CIML's assets under management at the time of the sale, Defendants did not secure any portion of the proceeds of the sale for the benefit of the Plan.

49.      In short, while Caterpillar used its employees' retirement assets, including Plan assets, as seed money to establish a mutual fund company which it thereafter operated and sold for a profit, Caterpillar and the other Defendants allowed Caterpillar to benefit from this use of Plan assets to the exclusion of the Plan.

50.      By this conduct, Defendants breached their fiduciary duties.

**Failure to Capture Additional Compensation Streams for the Benefit of the Plan**

51.     Beyond collecting fees from the Plan through Hard Dollar and Revenue Sharing payments, Plan service providers receive additional, undisclosed compensation from their dealings with the Plan and Plan assets ("Additional Compensation Streams").  For example:

- consultants receive finders' fees from investment managers for the consultants' placement of Plan assets with a certain investment manager or mutual fund company;

- trustees or custodial banks perform cash sweeps of Plan accounts to capture cash before it is transferred to investment options, and earn interest on those cash holdings;

- investment managers, custodial banks, prime bankers, and/or mutual funds receive payments for lending securities, owned by the Plan, to third parties; and

- in connection with foreign investments, investment managers and mutual funds reap additional compensation from profiting on foreign currency exchange.

52.     In a multi-billion dollar plan, like the Plan here, such Additional Compensation Streams can result in millions of dollars of funds available to the Plan.

53.     Accordingly, Plan fiduciaries must also understand and consider these Additional Compensation Streams in fulfilling their fiduciary obligations to ensure that the compensation that service providers receive is reasonable in light of the services provided, that the Plan receives the full benefit of revenue streams generated in connection with Plan assets, that Plan fees and expenses are incurred solely for the benefit of the Plan and its participants and beneficiaries, and are free of conflicts of interest and prohibited transactions.

54.     Here, Defendants have failed to do so.

**Inclusion of Retail Mutual Funds
As Plan Investment Options**

55.    The prudent selection of investment options for the Plan is one of Defendants'
core fiduciary obligations.

56.    Defendants included at least ten (10) retail mutual funds as Plan investment
options in 2004 and in the preceding years – the vast majority of which were managed by CIML.

57.    In 2005, the Plan held approximately $3.94 billion in assets.  In 2004, it held
approximately $3.44 billion, and in 2003, $2.93 billion.

58.    In the financial and investments industry, a large institutional investor with
billions of dollars, like the Plan, routinely can obtain lower prices for investment management
services than can a retail investor with only thousands, or even a few million, dollars.

59.    Defendants – as fiduciaries of a multi-billion retirement savings Plan – had
enormous bargaining leverage in the investment marketplace.  They squandered this leverage by
subjecting the Plan and its participants to the high costs of retail/publicly-traded mutual funds
and by failing to consider or provide investment options with significantly lower costs, such as
separate accounts, and low-cost index funds, such as the U.S. Government Thrift Savings Plan
(TSP).

60.    As fiduciaries, Defendants' were obligated to use the Plan's bargaining power to
require that investment managers provide separate low cost investment accounts, collective
investment trusts or common collective funds ("Separate Accounts") as Plan investment options.

61.    Separate Accounts are investment vehicles in which investment managers pool
the assets of a large investor, like the Plan, into a private trust and manage them according to a
stated investment objective.  Like mutual funds, Separate Accounts offer various investment
styles (large cap, value, growth, balanced growth, small cap, international equity, etc.).

62.     However, Separate Accounts' operating expenses are substantially lower than those of mutual funds because they do not have to pay for advertising, marketing, and distribution, nor do they have to maintain the liquidity required for trading in publicly-traded mutual funds.

63.     Separate accounts also avoid subjecting Plan participants to conflicts of interest inherent in large mutual fund organizations.  Mutual fund managers' profit motive – driven by the assessment of fees against the fund's investments – conflict with investors' interest in reducing fees to maximize their returns.

64.     After Caterpillar sold CIML to T. Rowe Price, it changed the Plan's investment options from CIML-managed mutual funds to separate accounts.

## Payment for Active Investment Management

65.     In 2005, twelve (12) of the Plan's Funds were actively-managed.  In prior years, the Plan included even larger numbers of actively-managed Funds.  In actively-managed funds, investment managers purchase and sell securities in an effort to outperform the Fund's benchmark.  Active management is more expensive than passive management, in which Fund managers conform their holdings to those of a particular benchmark.

66.     The inclusion of actively-managed retail mutual funds is detrimental to the interests of the Plan and its participants and beneficiaries.  It repeatedly has been established that actively managed funds rarely outperform such indexes on a risk-adjusted basis when held as long-term investments.

67.     Defendants' inclusion in the Plan of actively-managed retail mutual funds provides no added value to participants while forcing them to bear substantial and unnecessary

68.     Including actively-managed mutual funds as investment options in the Plan virtually guaranteed that participants and beneficiaries would receive less than a market return on their long-term retirement savings.  Had Defendants properly selected investment options, participants and beneficiaries could have received market returns.

69.     By including actively-managed mutual funds as investment options, Defendants breached their core fiduciary duties to the Plan.

### "Closet" or "Shadow" Index Funds Charging the Plan For Active Management

70.     The Plan pays extremely high active management fees to CIML and other Fund managers.  In return. Plan participants *should* enjoy substantially higher returns than those provided by low-cost index funds.  They do not.

71.     Despite paying the higher costs for active management, several of the Plan's Funds – which charge for active management – are structured and behave like index funds. These are "Closet Index Funds" or "Shadow Index Funds."

72.     The managers of the Plan's Shadow or Closet Index Funds seek to achieve returns similar to those of their benchmark/index, without exactly replicating its holdings.  They are similar to the index in terms of weighting, industry sector or geography, or otherwise try to substantially replicate it, yet paid higher active management rates.

73.     In the Plan's Shadow or Closet Index Funds, ninety-five (95%) percent or more of the variation in the Funds' investment gains and losses is correlated statistically to such variations in the benchmark/index against which the Fund measures its performance.

74.     In short, while the performance of such Shadow or Closet Index Funds mirrors that of its benchmark/index, Fund managers charge for active management, resulting in lower performance after fees that is available in true low-cost index funds.

75.     It is unreasonable and excessive to pay, as the Plan has, top-rate retail expense ratios for active management of a Fund whose performance mirrors that of Fund's index/benchmark.  The same investment performance is available to the Plan through passively-managed index funds charging far lower fees.

76.     Defendants breached their fiduciary duties by including Closet or Shadow Index Funds among the Plan's investment options.

### Fees and Cash Holdings in the Caterpillar Stock Fund

77.     Through the Plan's Caterpillar Stock Fund, participants can invest their 401(k) retirement savings in Caterpillar Stock.

78.     The Caterpillar Stock Fund does not need to pay for investment management.  It holds an undiversified portfolio of Caterpillar stock.  The Caterpillar Stock Fund's fees should be minimal.  They are not.

79.     The Caterpillar Stock Fund, as a retirement savings vehicle, is intended for long-term investing.  There is no need for it to hold substantial amounts of cash.

80.     The Caterpillar Stock Fund's cash holdings reduce the Fund's return because the value of the cash remains static.

81.     Defendants breached their fiduciary duties by: (A) charging, and or allowing to be charged, excess and unreasonable fees and expenses to participants' retirement savings in the Caterpillar Stock Fund; (B) maintaining and holding, causing to be maintained or held, or

18

allowing to be maintained or held, excess cash in the Caterpillar Stock Funds and thereby

impairing participants' returns; (C) obscuring, and/or misleading participants about, these facts.

## Defendants' Campaign of Misrepresentation and Concealment

82.    As set forth above, Defendants have misled Participants by representing that

Caterpillar pays the administrative costs of the Plan, when, in truth, Defendants have ensured

that some, if not all, of such administrative costs are borne by the Plan through hidden Revenue

Sharing arrangements.

83.    As set forth above, Defendants have not disclosed, and/or have affirmatively

concealed, a litany of material information including:

> A.    That they had used participants' retirement savings as seed money to
> establish a for-profit company, CDIL, which – in clear breach fiduciary
> obligations – reaped excess and prohibited profits from Plan participants'
> retirement savings and was sold for a substantial profit because it could claim
> participants' retirement savings as assets under management;
>
> B.    That the Plan's investment options impose, through their expense ratios,
> excessive fees upon the Plan in favor of a Caterpillar wholly-owned subsidiary;
>
> C.    That while paying for active management, participants are receiving poor
> returns that could be outdone by passively managed index funds;
>
> D.    That while paying for actively-managed Funds, participants received
> Closet Index Funds;
>
> E.    That the cash and fees assessed in the Caterpillar Stock Fund are
> unreasonable and excessive, and undermine participants' returns;

F.      That the Plan's size and asset value enabled Defendants to provide lower-priced investment options;

G.      That the fees charged, including fees for active investment management, assessed against participants' retirement savings were depriving them of the opportunity to receive market returns;

H.      That the excessive fees and expenses assessed against their accounts substantially would undermine the value of participants' retirement savings over time;

I.      That by including retail/publicly-traded mutual funds as Plan investment options, Defendants had squandered the Plan's enormous bargaining power and left participants of a $3.94 billion plan in the same circumstances as small, retail investors;

J.      That Plan service providers were and/or are engaging in Revenue Sharing, and the amount they were receiving as a result of Revenue Sharing;

K.      That Revenue Sharing was, and is, available for the benefit of the Plan and its participants;

L.      That Plan service providers were and/or are receiving excess payments via Additional Compensation Streams, and that such monies were available for the benefit of the Plan but not captured for the Plan;

M.      That the expense ratios charged in Plan investment options were and are inflated to include Revenue Sharing amounts *not* used for the investment management and operation of the investment option/Fund, *(i.e.* the ostensible purpose for the imposition of such fees) *but rather paid to other Plan service*

*providers* for recordkeeping and administrative functions and/or for other

undisclosed reasons;

N.     That, through these hidden Revenue Sharing programs, Defendants shifted

Caterpillar's obligation to pay Plan administrative expenses to the Plan and its

participants and beneficiaries;

O.     That the expense ratios of Plan investment options/Funds are inflated and

include monies to be used to support Funds' Revenue Sharing programs so that

the *stated expense ratio is not the true and accurate cost of investing* in the

investment option/Fund;

P.     Who is receiving Plan assets, derived from participants' accounts, through

Revenue Sharing and/or Additional Compensation Streams;

Q.     How much each service provider is paid with Plan assets, derived from

participants' accounts, when Hard Dollar fees *and* Revenue Sharing *and*

Additional Compensation Streams are considered;

R.     Whether the total amount paid to services providers (*i.e.* disclosed, Hard

Dollar fees *combined with* Revenue Sharing payments *and* Additional

Compensation Streams) is reasonable in light of the services provided and

incurred solely for participants' benefit;

S.     Whether plan fiduciaries have forgone Revenue Sharing and/or Additional

Compensation Streams available in connection with Plan investment options, and

thereby unnecessarily increased the expenses which Plan participants otherwise

must bear;

T.      The true and accurate amount of recordkeeping and administrative fees that are assessed against participants' accounts in the Plan; in that Plan record-keepers and administrators receive *both* the fees disclosed as Hard Dollar payments to them and *undisclosed* payments derived from Revenue Sharing hidden within the expense ratios of Plan investment options/Funds;

U.      The true and accurate price of Plan investment options/Funds, in that the stated expense ratios of Plan investment options/Funds are overstated so as to include extra, hidden monies to be used for Revenue Sharing payments;

V.      The true and accurate amount of fees paid to investment managers *for actual investment management services* (*i.e.* the actual amount of investment management being purchased) in any Plan investment option/Fund; in that the investment management prices represented in the expense ratios of Plan investment options/Funds are overstated so as to include extra monies to be used for Revenue Sharing payments;

W.      In actively-managed investment options/Funds, the actual amount of active management services that Plan participants are purchasing, in that the inclusion of undisclosed Revenue Sharing amounts in the expense ratios of actively-managed investment options/Funds renders participants incapable of knowing whether the higher fees charged by actively-managed Funds actually are used for active investment management rather than Revenue Sharing payments; and

    X.     That hidden payments of Plan assets, derived from participants' accounts, are masking prohibited transactions and/or conflicts of interests between or among Caterpillar, Plan fiduciaries and service providers.

84.    Because the Defendants failed and refused to provide them with this information, and concealed this information from them, Plan participants and beneficiaries have lacked the information necessary for them: (a) to understand and protect their interests in the Plan; (b) to have knowledge regarding the Defendants' breaches of fiduciary duty; and (3) to have reason to believe they should make inquiry about those breaches and the facts underlying them.

85.    Defendants know that Plan participants lack such information and knowledge.

86.    In their fiduciary roles, Defendants are the parties with the information necessary to know and understand whether the participants' rights and protections under ERISA are being, or have been, violated.  ERISA fiduciaries, such as Defendants here, have an affirmative obligation to provide full and accurate information to the Plan participants regarding the administration of the Plan.  They have not done so.

87.    As a result of all of the foregoing, including Defendants' campaign of non-disclosure, concealment and misrepresentation, Plaintiffs, the Plan, and all participants and beneficiaries have been forced to pay excessive fees and expenses from their 401(k) accounts, have suffered financial losses and damages, and have been deprived of the opportunity to receive market returns.

## COUNT I:

### [Breach of Fiduciary Duty – ERISA §502(a)(2)]

88.    Plaintiffs restate and incorporate the allegations contained in ¶¶ 1 through 87 as though fully set forth here.

89.     As set forth in detail above, Defendants owe to the Plan, its participants and beneficiaries, and the Class extensive fiduciary duties including, without limitation:

A.  To conduct itself as Plan Sponsor and Administrator with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent ERISA professional fiduciary would in operating and administering a 401(k) plan the size and character of the Plan;

B.  To perform its duties as Plan Sponsor and Administrator with the utmost loyalty and fidelity to the Plan and its participants and beneficiaries, avoiding at all times conflicts of interest, self-interest, and duplicity;

C.  To ensure, at all times, that Plan assets "shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan;"

D.  To properly and prudently select investment alternatives for the Plan;

E.  To ensure, at all times, that the Plan avoid prohibited transactions;

F.   To know and understand the fees and expenses charged to the Plan, and whether they were or are unreasonable or excessive;

G.  To track and account for all transactions involving the Plan and Plan assets so as to ensure that Plan assets are retained, managed, and disbursed in compliance with the Plan Document and ERISA;

H.  To track and account for all transactions involving the Plan and Plan assets so as to ensure that Plan assets "never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in

the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan;"

I.   To ensure that the fees and expenses incurred by the Plan are reasonable and incurred for the sole and exclusive benefit of Plan participants and beneficiaries;

J.   In entering into agreements with service providers to the Plan, to ensure that the payments from the Plan – whether they are direct or indirect – are reasonable for the services provided and made for the sole and exclusive benefit of Plan participants and beneficiaries;

K.   In operating and administering the Plan, to establish, implement, and follow procedures to properly and prudently determine whether the fees and expenses paid by the Plan were reasonable and incurred solely for the benefit of Plan participants;

L.   In operating and administering the Plan, on an ongoing basis to monitor that the payments made by the Plan to service providers – whether they are direct or indirect – are and remain reasonable for the services provided and made for the sole and exclusive benefit of Plan participants and beneficiaries;

M.  To inform itself of, and understand, the various methods by which vendors in the 401(k) industry collect payments and other revenues from 401(k) plans;

N.   To inform itself of trends, developments, practices, and policies in the retirement, financial investment and securities industry which affect the Plan; and to remain aware and knowledgeable of such trends, practices and policies on an ongoing basis;

O.  To communicate with Plan participants and beneficiaries regarding the Plan honestly, clearly and accurately;

P.  To affirmatively and without request provide Plan participants and beneficiaries with honest, accurate and complete information they need to understand their investments in the Plan; the management, risk, potential returns of such investments; and the fees and expenses incurred in connection with those investments; and

Q.  To provide honest, accurate and complete information to Plan participants and beneficiaries regarding the costs associated with their various investment choices and directions.

90.     As set forth in detail above, Defendants breached their fiduciary obligations to the Plan, Plan participants and beneficiaries and the Class by, among other conduct to be proven at trial:

A.  Establishing and operating a for-profit subsidiary using its participants' funds and Plan assets, thereby making a profit from Plan assets and failing to operate the Plan for the sole benefit of Plan participants;

B.  Failure to secure, for the benefit of the Plan, all proceeds arising from the use of Plan assets, including proceeds from the sale of CIML;

C.  Shifting Caterpillar's obligation to pay the Plan's administrative expenses to the Plan and its participants and beneficiaries through hidden Revenue Sharing arrangements;

D.  Causing the Plan, and its participants and beneficiaries, to pay excessive and unreasonable fees to CIML, a wholly-owned Caterpillar for-profit subsidiary;

E.   Choosing, and including as Plan investment options, Closet Index Funds;

F.   Causing and/or allowing the Caterpillar Stock Fund to hold cash and assess fees so as to impair participants' returns;

G.  Squandering the Plan's enormous bargaining power to obtain low-cost investment options, and instead subjecting the Plan and its participants and beneficiaries to high-priced retail/publicly traded mutual funds;

H.  Failing to employ the Plan's enormous bargaining power to obtain separate accounts and/or other low-cost investment options that provide a market return and are appropriate for a multi-billion dollar 401(k) plan;

I.   Failing to properly and prudently select plan investment options, making selections for self-interested reasons, and/or abdicating their responsibilities in this regard;

J.   Causing the Plan to pay fees and expenses that were, and continue to be, unreasonable and/or not incurred solely for the benefit of Plan participants and beneficiaries;

K.  Engaging in self-interested and prohibited transactions;

L.   Failing to monitor the fees and expenses paid by the Plan and, by such failure, causing and/or allowing the Plan to pay fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of Plan participants and beneficiaries;

M.  Failing to know and understand the fees and expenses charged to the Plan, and whether they were or are unreasonable or excessive;

N.  Failing to inform themselves of trends, developments, practices, and policies in the retirement, financial investment and securities industry which affect the Plan; and failing to remain aware and knowledgeable of such trends, practices and policies on an ongoing basis;

O.  Failing to inform itself of, and understand, the various methods by which vendors in the 401(k) industry collect payments and other revenues from 401(k) plans;

P.  Failing to establish, implement, and follow procedures to properly and prudently determine whether the fees and expenses paid by the Plan were reasonable and incurred solely for the benefit of Plan participants;

Q.  Failing to communicate with Plan participants and beneficiaries regarding the Plan honestly, clearly and accurately;

R.  Concealing material information about the Plan and Plan administration and costs from Plan participants and beneficiaries;

S.  Selecting numerous high-priced retail mutual funds as Plan investment options, and thereby breaching their fiduciary duty to select reasonable and prudent investment choices for the Plan;

T.  Allowing Plan service providers, at the Plan's expense, to receive Revenue Sharing transfers, and failing to capture Revenue Sharing for the benefit of the Plan and its participants;

U.  Allowing Plan service providers, at the Plan's expense, to receive Additional Compensation Streams; and failing to capture Additional Compensation

Streams such as float and available profit from securities lending for the benefit of the Plan and its participants;

V. Failing properly to inform and/or disclose to Plan participants the fees and expenses that are, or have been, paid by the Plan;

W. Failing to inform and/or disclose to Plan participants in proper detail and clarity the transactions, fees and expenses which affect participants' accounts balances in connection with the purchase or sale of interests in investment alternatives and concealing material information regarding such matters;

X. Failing to discover, disclose and stop the charging of hidden and excessive fees to the Plan;

Y. Failing to disclose to Plan participants and beneficiaries that the Plan's investment options subjected their retirement savings to excessive and unreasonable fees in light of the Plan's size and bargaining power in the investment marketplace; and

Z. Failing to disclose to Plan participants and beneficiaries that defendants had chosen plan investment options without considering appropriate information and investment alternatives in light of the Plan' size and asset value.

91.     By the foregoing conduct, Defendants failed to exercise the loyalty, care, skill, prudence and diligence that a prudent person would when acting in like capacity and familiar with such matters.

92.     As set forth in detail above, as a result of these breaches, the Plan, Plaintiffs, the Class, and the Plan's participants and beneficiaries have suffered financial losses and damages.

93.      Pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(a), Defendants are personally liable to make good to the Plan for the losses it experienced as a result of Defendants' breaches of fiduciary duty.

94.      Pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(a), Defendants are personally liable for any other available and appropriate equitable relief, including prospective injunctive relief and declaratory relief, and attorney's fees.

## COUNT II:
### [Other Remedies for Breach of Fiduciary Duty – ERISA §502(a)(3)]

95.      Plaintiffs restate and incorporate the allegations contained in ¶¶ 1 through 94 as though fully set forth here.

96.      In addition to, and as an alternative to, the causes of action stated in Count I, Plaintiffs seek further relief pursuant to  ERISA § 502(a)(3), 29 U.S.C., § 1132(a)(3).

97.      Under ERISA §502(a)(3), a participant may enjoin any act which violates ERISA or may obtain other appropriate equitable relief to redress such violations or enforce the terms of ERISA.

98.      Defendants are the primary fiduciaries of the Plan and occupy a position of trust and confidence in connection with the Plan, the Plan's assets, and the Plan's participants and beneficiaries.

99.      Defendants have exclusive discretion and control over the Plan's assets and are strictly obligated to exercise that control "for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan."

100.    By accepting possession and control over Plan participants' assets, Defendants necessarily have also accepted the obligation to explain and account for every transaction, expenditure, application and distribution of such assets.

101.    Although *only* Plan participants and beneficiaries are entitled to Plan assets and to the benefit of Plan assets, in the absence of full and candid disclosure from Defendants, Plan participants and beneficiaries do not know, and have no means of knowing, how their assets have been managed and disbursed.

102.    Accordingly, Defendants occupy the position of a common law trustee in connection with the Plan, its assets, and its participants and beneficiaries.

103.    As set forth in detail above, Defendants have caused the Plan to pay – directly and via hidden Revenue Sharing transfers and hidden Additional Compensation Streams – excess fees and expenses to Plan service providers.   Further, Defendants have engaged in self-interested transactions and used Plan assets to establish, operate, and sell a for-profit business.  Litigating and resolving these issues will involve identifying and reconciling multiple transfers, payments, and flows of Plan assets that occurred while such Plan assets were within Defendants possession and control.

104.    Defendants, and not the Plaintiffs, are the entities which have and/or should have specific and detailed information regarding how Plan assets have been treated and disbursed in this regard.

105.     An accounting is a particularly appropriate equitable remedy in circumstances where, as here, the underlying action and accounts are so complicated that a normal action for a fixed sum may not be practical.

106.     In such an accounting, in light of their possession and control of Plan assets and information about how Plan assets have been used, applied, and distributed, Defendants must bear the burden of proving all Plan transactions and their propriety.

107.     Accordingly, the Court should order that Defendants render an accounting of all profit transactions, disbursements and dispositions occurring in, in connection with, and/or in respect of the Plan and its assets.

108.     Plaintiffs respectfully request that the Court order that such an accounting include, without limitation, detailed and specific information regarding: (a) all fees and expenses incurred by the Plan and/or paid to third parties, whether paid directly by the Plan or indirectly transferred among Plan service providers or other third parties; and (b) all revenues and profits of Caterpillar, CIML and/or related entities received in respect of Plan assets.

109.     Plaintiffs respectfully request that the Court charge/surcharge against the Defendants and in favor of the Plan all amounts involved in transactions which such accounting reveals were or are improper, excessive and/or in violation of ERISA.

110.     Plaintiffs respectfully request that the Court order Defendants to disgorge all: (a) amounts credited to Caterpillar for administrative costs which Caterpillar was obligated to pay and which Defendants assured Plan participants it did pay; and (b) all profits Caterpillar, CIML, and/or related entities received in respect of Plan assets.

111.     Plaintiffs further seek injunctive and other appropriate equitable relief to redress the wrongs described above and to cause them to cease so that the Plan's participants and beneficiaries to receive the full benefit of their retirement savings in the future.

         WHEREFORE Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- find and declare that the Defendants have breached their fiduciary duties as described above;

- find and adjudge that Defendants are personally liable to make good to the Plan all losses that the Plan incurred as a result of the conduct described above and to restore the Plan to the position it would have been in but for the breaches of fiduciary duty;

- award actual monetary losses to the Plan;

- impose a constructive trust on any monies by which the Defendants were unjustly enriched as a result of their breaches of fiduciary duty and cause the Defendants to disgorge such monies and return them to the Plan;

- remove the fiduciaries who have breached their fiduciary duties and/or enjoin them from future breaches of ERISA;

- require Defendants to render an accounting as set forth above;

- surcharge against Defendants and in favor of the Plan all amounts involved in transaction which such accounting reveals were or are improper, excessive and/or in violation of ERISA;

- permanently enjoin Defendants from breaching their fiduciary duties in each respect set forth in the Complaint;

- award to the Plaintiffs and the Class their attorneys fees and costs pursuant to ERISA § 502(g);

- order costs and attorneys fees pursuant to ERISA § 502(g) and the common fund doctrine;

- order equitable restitution or other available equitable relief against the Defendants;

- order the payment of interest to the extent it is allowed by law; and

- grant any other and further relief the Court deems appropriate.

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL COUNTS AND ISSUES SO TRIABLE.**

Respectfully Submitted,

SCHLICHTER, BOGARD & DENTON


By:   /s/ Daniel V. Conlisk
      Jerome J. Schlichter
      Daniel V. Conlisk
      Heather Lea
      100 S. Fourth St., Suite 900
      St. Louis, Missouri 63102
      (314) 621-6115
      (314) 621-7151 (Fax)
      dconlisk@uselaws.com
      hlea@uselaws.com
      Belleville Illinois Office
      120 West Main Street, Ste. 208
      Belleville, IL  62220

      Michael Waters
      Local Counsel
      Vonachen, Lawless, Trager & Slevin
      456 Fulton Street, Ste. 425
      Peoria, Illinois 61602
      (309) 676-8986
      (309) 676-4130 (Fax)

      ATTORNEYS FOR PLAINTIFFS/
      CLASS REPRESENTATIVES
      Steve Martin, Carol Tegard, Denayer Artis,
      Allen Rose, and Doug Hildebrand

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 5, 2007, I served this SECOND AMENDED COMPLAINT FOR BREACH OF FIDUCIARY DUTY for with the Clerk of the Court using the CM/ECF system which will send notification of such filing(s) to the following:

Ian Morrison
Mark Casciari
Seyfarth Shaw, LLP
131 South Dearborn Street, Ste. 2400
Chicago, IL  60603
(312) 460-5000
mcasciari@seyfarth.com
Defendants Benefit Funds Committee of Caterpillar, Inc.
Caterpillar Investment Management Ltd.


<u>      s/ Daniel V. Conlisk      </u>