**E-FILED**
Wednesday, 11 August, 2010  02:16:43 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT FOR
## THE CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Steve Martin, Carol Tegard, and | ) | |
| Allen Rose, as representatives of | ) | |
| a Class of similarly situated persons, | ) | |
| and on behalf of the Caterpillar 401(k) | ) | |
| Plan, Caterpillar Inc. Tax Deferred Savings | ) | Case No. 07-1009 JBM/JAG |
| Plan, Caterpillar Inc. Tax Deferred | ) | |
| Retirement Plan, and the Solar Turbines | ) | Judge Joe Billy McDade |
| Savings and Investment Plan, | ) | |
| | ) | Magistrate Judge John A. Gorman |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Caterpillar, Inc., Benefit Funds | ) | |
| Committee of Caterpillar Inc., Employee | ) | |
| Benefit Funds of Caterpillar Inc., | ) | |
| Investment Plan Committee of | ) | |
| Caterpillar Inc., Caterpillar Investment | ) | |
| Management Ltd., and Vice President | ) | |
| Of Human Services Division of | ) | |
| Caterpillar, Inc., | ) | |
| | ) | |
| Defendants. | ) | |

## THIRD AMENDED COMPLAINT FOR BREACH OF FIDUCIARY DUTY

1.       In this action, pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), Plaintiffs, Class

Representatives and Plan Representatives Steve Martin and Carol Tegard, and Allen Rose, on

behalf of the Caterpillar, Inc. 401(k) Plan, Caterpillar Inc. Tax Deferred Savings Plan, Caterpillar

Inc. Tax Deferred Retirement Plan, and the Solar Turbines Savings and Investment Plan

(collectively, including all predecessor and successor plans, "the Plans,") and similarly situated

participants and beneficiaries in the Plans, seek to recover the losses suffered by the Plans, and to

obtain injunctive and other equitable relief for the Plans, from Caterpillar Inc. ("Caterpillar"), the

Plan Sponsor, the Benefit Funds Committee of Caterpillar Inc. (the "BFC"), the Plan

Administrator, Caterpillar Investment Management Company ("CIML") and other Defendants identified below (collectively "Defendants") based upon breaches of their fiduciary duties.

2.      As set forth in detail below, Defendants violated the terms of the written documents governing the Plans and breached their fiduciary duties in that they engaged in conflicts of interest and prohibited transactions; used assets of the Plans as seed money to establish a Caterpillar owned for-profit mutual fund company, CIML, to reap profits from the Plans; operated CIML and its Preferred Group of Mutual Funds ("PGMF") based almost exclusively on Plan assets; profitably sold the PGMF without recognizing the Plans' pivotal role in its establishment and operation; selected imprudent Preferred Group retail mutual funds as eleven of the Plans' thirteen investment options (the Caterpillar Stock Fund and an equity index mutual fund completed the menu); squandered the Plans' immense bargaining power, based on their billions of dollars of assets, by including retail mutual funds as Plan investment options when superior investments were available at lower prices in the wholesale investment marketplace; included, as Plan investment options, shadow index funds, which charged excessive fees for active management while structuring their portfolios to replicate index funds in terms of investment mix and fees; allowed the Plans to pay excessive fees for administrative services, including but not limited to recordkeeping services; included as the Plans' investment options imprudent actively managed investment options whose performance net of fees did not exceed that of similar investments, including passive (i.e., index) investments; and allowed excessive cash to be maintained in the Caterpillar Stock Fund, contributing to yet more investment losses.

3.      As a result of these breaches and others set forth below, Defendants caused damages to the Plan and are subject to legal and equitable relief.

## PARTIES, JURISDICTION AND VENUE

### Plaintiffs:

4.      Plaintiff, Class Representative and Plan Representative Steve Martin, is a resident of Booneville, Missouri.

5.      Plaintiff, Class Representative and Plan Representative Carol Tegard, is a resident of Hanna City, Illinois.

6.      Plaintiff, Class Representative and Plan Representative Allen Rose, is a resident of Edwards, Illinois.

7.      Plaintiffs, Class Representatives and Plan Representatives Steve Martin and Carol Tegard, are participants in the 401(k) Plan.

8.      Plaintiff, Class Representative and Plan Representative Allen Rose, is a participant in the Savings Plan.

### Defendants:

9.      Defendant Caterpillar Inc. is a Delaware corporation with its headquarters in Peoria, Illinois and facilities located throughout the United States and around the world.

10.     Defendant Caterpillar, Inc. is the Plan Sponsor and the Plan Administrator of the 401(k) Plan pursuant to ERISA § 3(16).

11.     Plaintiffs are informed and believe that Defendant Benefit Funds Committee (the "BFC") is a named fiduciary of the Plans.  The BFC is comprised of Caterpillar officers and employees and serves at the appointment and discretion of Caterpillar.

12.     Plaintiffs are informed and believe that Defendant Employee Benefit Funds of Caterpillar Inc. (the "EBF") is comprised of Caterpillar officers and employees and serves at the appointment and discretion of Caterpillar.  The EBF is a functional and/or *de facto* fiduciary of

3

the Plans because it exercises discretionary control over the management of the Plan and or the disposition of its assets in that it:

      A.    Provides in-house investment advice that governs the selection and monitoring of sub-advisor investment managers within CIML's PGMF's retail mutual funds and causing the Plan to invest in such funds for the Plans; and

      B.    According to documents that Defendants recently produced, Defendants' legal advisors identified the EBF as a fiduciary of the Plans.

13.    Based upon documents and information, Plaintiffs are informed and believe that Defendant Investment Plan Committee of Caterpillar Inc. (the "IPC") is a named fiduciary of the Plans and performs fiduciary functions such that it is a functional or *de facto* fiduciary. The IPC is comprised of Caterpillar officers and employees and serves at the appointment and discretion of Caterpillar.

14.    Defendant Caterpillar Investment Management, Ltd. ("CIML") was a wholly-owned subsidiary of Caterpillar. CIML was a functional and/or de facto fiduciary of the Plans because it exercises discretionary control over the management of the Plan, the disposition of its assets and/or the administration of the Plan in that:

      A.    CIML managed the vast majority of assets of the Plans and, in so doing, was merely a shell through which Caterpillar Plan fiduciaries directly managed Plan assets while doing so through CIML's retail mutual fund structure. CIML's role, and those of other Plan fiduciaries was so intertwined that CIML did not operate as a separate entity but jointly with

such other Plan fiduciaries in exercising control over Plan administration and assets.

B.     At various times, CIML's President was a voting member of the BFC and, in that role, exercised direct control over the Plan and its assets and administration;

C.     CIML exercised discretion and control over Plan assets and administration by allowing, despite its purportedly separate corporate structure, Plan fiduciaries to manage its retail mutual funds and select investment sub-advisors for those funds; and

D.     By doing so, the fiduciary roles of CIML and Caterpillar Plan fiduciaries became intertwined and indistinct such that they jointly exercised discretion and control over Plan assets.

## Jurisdiction and Venue:

15.     Plaintiffs bring this action pursuant to ERISA §§ 502(a)(2) & (3), 29 U.S.C. § 1132(a)(2) & (3), which provide that any Plan participant may pursue civil actions on behalf of the Plan to remedy breaches of fiduciary duty as set forth in ERISA § 409, 29 U.S.C. § 1109, and to obtain other appropriate equitable relief. This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1)(2).

16.     This Court has supplemental jurisdiction over Count IV, pursuant to 28 U.S.C. § 1367(a), in that this claim is so related to the other claims in this action upon which this Court has original jurisdiction that it forms part of the same case or controversy under Article III of the United States Constitution.

17.     All Defendants are subject to service of process issued from this Court pursuant to 29 U.S.C. § 1132(e)(1)(2).

18.     Venue is proper in this Court pursuant to 29 U.S.C. § 1132(e)(2).

## Rule 23 Requires Class Certification:

19.     Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the Plans, themselves and all similarly situated Plan participants and beneficiaries.  Each of the Plans exist within the same Master Trust and offer the same investment options with the same fees and expenses.  Each of the Plans is comprised of a unitary trust corpus in which the respective Plaintiffs, as designated herein, and each Plan participant, has an interest.  Plaintiffs seek to represent the following (the "Class"):

> All persons, excluding the Defendants, and BFC and IPC members between May 31, 1992 and September 15, 2009, who were or are participants or beneficiaries of the Plans between May 31, 1992 and September 15, 2009.

20.     Certification of this Class is proper under Rule 23(a) in that:

A.     **Numerosity**.  The members of the Class are so numerous that joinder of all members is impracticable.  Although the Plaintiffs do not know the exact number of Class members as of the date of filing, the 401(k) Plan's public documents state that, at the end of the 2006 Plan year, there were 34,142 participants with account balances in the 401(k) Plan.  The Savings Plan's public documents state that, at the end of the 2006 Plan year, there were 7,364 participants with account balances in the Savings Plan.  Additional Class members are participants in the Caterpillar Inc. Tax Deferred Retirement Plan and the Solar Turbines Savings and Investment Plan.

B.     **Commonality**.  Common issues of fact and law predominate over any issues unique to individual Class members.  Issues that are common to all

Class Members include, but are not limited to, Defendants' violations of the express terms of documents governing both of the Plans or ERISA when they:

i.      Violated the Plan documents as set forth below;

ii.     Engaged in a campaign of self-interested and prohibited transactions by establishing a for-profit company, CIML, with Plan participants' retirement savings and reaping prohibited profits by doing so;

iii.    Engaged in a campaign of conflicts of interest and prohibited transactions by including, as Plan investment options, virtually exclusively retail mutual funds (the Preferred Group of Mutual Funds) operated by Caterpillar's wholly-owned subsidiary, CIML;

iv.     Squandered the Plans' enormous bargaining power, based upon its multi-billion asset size, by including almost exclusively *retail* mutual funds as Plan investment options when superior and less expensive investment vehicles were available to large institutional investors in the *wholesale* investment marketplace;

v.      Included investment options that, while generating profits for Caterpillar through its wholly-owned subsidiary, CIML, caused Plan participants to consistently under-perform the market for long-term retirement savings;

vi.     Failed to understand, control, and/or capture for the benefit of the
        Plans monies generated by various compensation streams of Plan
        service providers;

vii.    Violated their fiduciary duty by including in the Plans shadow
        index funds, managed by CIML to profit Caterpillar, that assessed
        fees ostensibly for active investment management of Plan assets
        but, in reality, provided virtually no active investment management
        services and instead structured such funds to replicate the holding
        of relevant asset class indexes and to track the performance of such
        indexes less the management fees assessed;

viii.   Caused the Plans to pay for active investment management,
        provided by CIML to profit Caterpillar, without prudent and proper
        fiduciary consideration of whether such active management would
        outperform passive management on a long term, risk adjusted
        basis;

ix.     Impaired participants' retirement savings by imprudent operation
        of the Caterpillar Stock Fund that resulted in holding cash in that
        fund instead of Caterpillar Stock;

x.      Failed to capture profits available to the Plans, due to their size,
        from such activities as securities lending and use of float, and/or
        failed to use such profits to offset the fees charged by other service
        providers, as required by DOL regulations, and instead caused

such revenues and profits to accrue to CIML for the benefit of Caterpillar;

xi. Based on BFC committee meeting minutes recently produced, Plaintiffs are informed and believe Defendants either, at various points in time, (1) used Plan assets as part of a securities lending program from which Caterpillar profited, or (2) failed to include the Plan from participating in a successful securities lending program;

xii. By including almost exclusively retail mutual funds rather than appropriate collective trust and/or separately-managed accounts, rendered themselves incapable of negotiating directly with Plan investment managers, record keepers, trustees and others to secure for the benefit of the Plan the proceeds and profits available to the Plans, due to their size, from such activities as securities lending and use of float and instead caused such revenues and profits accrue to CIML for the benefit of Caterpillar;

xiii. Subjected the Plans to fees and costs that were assessed against Plan assets for the benefit of CIML and Caterpillar and that were unreasonable and/or not incurred solely for the benefit of Plans and their participants and beneficiaries;

xiv. Subjected the Plans to the fees and expenses of the retail mutual fund marketplace when, due to the Plans' enormous bargaining power, superior and lower-cost investment options were available;

xv.     Subjected the Plans to the excessive trading cost incurred by active traders, conflicts of interest and scandals that plague the retail mutual funds industry;

xvi.    Failed to monitor the fees and expenses paid by the Plans and to consider, on an ongoing basis, whether such fees and expenses were excessive in light of the wholesale investment vehicles available to the Plan;

xvii.   Failed to inform themselves of, and understand, the superior investment vehicles available for lower fees and expenses in the wholesale investment marketplace;

xviii.  Failed to inform themselves of, and understand, the various methods by which vendors in the 401(k), financial and retirement industry collect payments and other revenues from 401(k) plans;

xix.    Failed to establish, implement, and follow procedures to properly and prudently determine whether the fees and expenses paid by the Plans were reasonable and incurred solely for the benefit of Plan participants;

xx.     Falsely represented that Caterpillar paid the Plans' administrative fees and costs when, in actuality, Caterpillar knew that participants paid such fees and costs to CIML so as to generate profits for Caterpillar;

xxi.    Breached their fiduciary duties by intentionally and falsely stating to Plan participants that the retail mutual fund fees they paid were

10

appropriate and in the best interest of the Plan when, in truth: (1) the lower fees available in the wholesale investment marketplace were appropriate and in the best interest of the Plans; and (2) such retail fees were collected by CIML to profit Caterpillar;

xxii.   In light of the foregoing and other conduct set forth in this Third Amended Complaint, failed to exercise the care, skill, prudence, and diligence that a prudent person would when acting in like capacity and familiar with such matters;

xxiii.  Caused and/or allowed fees and expenses to be paid by the Plans for purposes other than those allowed by ERISA;

xxiv.   By the conduct above and/or by other conduct set forth in this Third Amended Complaint, revealed in discovery and/or proven at trial, breached their fiduciary and other ERISA-imposed obligations to the Plans, Plan participants, and members of the Class;

xxv.    Are liable to the Plans and the Class for losses suffered as a result of the breaches of their fiduciary duties and other ERISA-imposed obligations;

xxvi.   Are responsible to account for the assets and transactions of the Plans and should be charged/surcharged for any transactions and payments for which they cannot account or which were not proper uses of Plan assets; and

xxvii.   Are subject to additional legal and equitable remedies in light of the foregoing.

C.      **Typicality**.  Each of the Plans is comprised of a unitary trust corpus in which each Plaintiff, and each Plan participant, has an interest recorded as a bookkeeping entry.  The claims brought by the Plaintiffs are typical of those of the absent Class members, in that:

i.      The Defendants owed the exact same fiduciary and other ERISA-based obligations to each Plan participant and beneficiary, and each member of the Class;

ii.     The Defendants owed the exact duties and obligations under the Plan documents to each Plan participant and beneficiary, and each member of the Class;

iii.    The Defendants' breach of those obligations constitutes a breach to each participant and beneficiary, and each member of the Class;

iv.     The proceeds from a judgment entered against Defendants will be paid to the Plans and applied for the benefit of the Plans and their participants.

D.      **Adequacy of Representation**.  The Plaintiffs are adequate representatives of the absent Class members and will protect such absent Class members' interests in this litigation.  The Plaintiffs do not have any interests antagonistic to the other class members nor do they have any unique claims or defenses that might undermine the efficient resolution of the

Class' claims.  Plaintiffs have retained competent counsel, versed in ERISA, class actions, and complex litigation.

21.     Class certification is also appropriate under Rule 23(b) and each subpart in that:

A.     Pursuant to Rule 23(b)(1)(A), in the absence of certification, there is a risk of inconsistent adjudications with respect to individual class members;

B.     Pursuant to Rule 23(b)(1)(B), in the absence of certification, litigation with respect to one participant could, as a practical matter, impact the rights of non-party participants.

C.     Pursuant to Rule 23(b)(2), as set forth above, the Defendants have acted on grounds generally applicable to the Class as a whole; and

D.     Pursuant to Rule 23(b)(3), as set forth above, common issues of law and fact predominate over any purely individual issues and thus a class action is superior to any other method for adjudicating these claims.

**Plaintiffs Are Plan Representatives Under ERISA**

22.     In the alternative to serving as Class Representatives under Rule 23, under ERISA's civil enforcement scheme, the Plaintiffs are also proper representatives and may properly assert the causes of action in this Third Amended Complaint and seek a remedy on behalf of the Plans for Defendants' various fiduciary breaches.

23.     Plaintiffs Steve Martin and Carol Tegard, are participants in the 401(k) Plan, one of four plans within the Caterpillar Inc. Investment Trust (the "Master Trust") and assert these claims on behalf of participants in the 401(k) Plan and the Master Trust to remedy Defendants' various breaches of fiduciary duties.

24.     Plaintiff Allen Rose, as a participant in the Savings Plan, another plan within the Caterpillar Inc Investment Trust (the "Master Trust") and asserts these claims on behalf of the Savings Plan and the Master Trust to remedy Defendants' various breaches of fiduciary duties.

## FACTS

### The Plans

25.     The Plans are each "defined contribution plans," as defined in ERISA § 3(34), 29 U.S.C. § 1002(34), and contain or is part of an "eligible individual account plan" under ERISA § 407(d)(3)(A), 29 U.S.C. §1107(d)(3)(A) .

26.     Upon information and belief, the 401(k) Plan is a successor Plan to the Caterpillar Inc. Employees Investment Plan.

27.     The Plans are administered through the Master Trust.  Through the Master Trust, Defendants provide the exact same investment options to the Plans.

28.     The Master Trust contains only assets of the Plans.

29.     The same fiduciaries and Caterpillar officers, agents and employees administer the Master Trust for the Plans.

30.     Before October 2003, the Plans included fourteen investment options.  Ten were CIML-managed Preferred Group Retail Mutual Funds; the others were a collective trust, US equity broad index fund, Caterpillar stock fund, and a mutual fund window.

31.     After October 2003, the Plans included eighteen investment options [the "Funds"], the fourteen set forth above and four "Model Portfolio" funds made up of a specific mix of the Plans' core investments.

32.     CIML managed these Funds for the profit of its parent, Caterpillar.

33.     Caterpillar has agreed to indemnify the BFC, the EBF, the IPC, individual employees, officers, members, and managers of the BFC, the EBF and the IPC, and each Trustee

for any and all liabilities and losses, costs or expenses of any kind or nature, except those incurred due to dishonesty, willful misconduct, or gross negligence.

## Defendants' Fiduciary Duties

34.     Defendants are bound by ERISA's imposition of a fiduciary duty that has been characterized as "the highest known to law."  Defendants' fiduciary obligations require that, at all times, they conduct themselves with the utmost good faith, loyalty and fidelity; act with the sole purpose of advancing the interests of the Plans, Plan participants and beneficiaries; scrupulously avoid all self-interest, duplicity and deceit; and fully disclose to, and inform participants and beneficiaries of, all material information.

35.     Defendants' fiduciary obligations under ERISA require that they exercise the care, skill and diligence which a prudent expert would in the operation of Plans with like character and aims.

36.     Defendants' fiduciary obligations under ERISA require that they discharge their duties with the exclusive purpose of providing benefits to Plan participants and beneficiaries and defraying the reasonable cost of administering the Plans.

37.     Defendants' fiduciary obligations under ERISA require that they ensure, at all times, that Plan assets are *never* used for the benefit of the employer; here, Caterpillar.

38.     Defendants' fiduciary obligations under ERISA require them to scrupulously avoid any transaction in which Plan assets would be used by, or inure to the benefit of, a party in interest in connection with the Plans, including Caterpillar.

## DEFENDANTS' MULTIPLE VIOLATIONS OF THE PLAN DOCUMENTS AND BREACHES OF FIDUCIARY DUTIES

### Violations of the Plan Documents

39.     Defendants are bound by a fiduciary duty to administer the Plan in accordance with the Plan document, including but not limited to the Investment Policy Statement, which requires among many things:

      A.     That Defendants consider many different types of investment vehicles, including mutual funds, commingled funds, and separately managed accounts;

      B.     That Defendants annually review the fees charged by existing investment options and whether they are proper in light of other available investment vehicles; and

      C.     That the Defendants closely monitor the investment options of the Plan.

40.     Defendants violated their fiduciary duty to administer the Plan in accordance with the Plan document, including but not limited to the Investment Policy Statement, in that they:

      A.     Almost exclusively retained mutual funds as investment options, and BFC Meeting Minutes recently produced indicate that Defendants did not consider other investment vehicles such as separately managed accounts and commingled funds;

      B.     Failed to annually review the fees charged by the Plans' investment options;

      C.     Failed to monitor the Plans' investment options, but, as indicated in the BFC Meeting Minutes recently produced, instead, disregarding the mutual fund structure of the Plan, Defendant fiduciaries of the Plan operated

16

CIML's mutual fund by, for example, deciding on the sub-advisors that CIML would retain in its purportedly-separate mutual funds. By doing so, Defendants managed Plan assets as they would in low-priced separate accounts (*i.e.* by directly selecting investment managers) but continued to cause the Plan to pay excessive retail mutual fund fees to CIML for the benefit of Caterpillar;

    D.    Disregarded the mutual fund structure and exercised discretion and control over purported-mutual fund assets as Plan assets.

41.    By this conduct, Defendants violated the Plan documents, breached their fiduciary duties to operate the Plans for the exclusive benefit of Plan participants, engaged in conflicts of interest and prohibited transactions, caused damages to the Plans, and are liable to the Plans for equitable relief including, but not limited to, an accounting, restitution and disgorgement.

**Caterpillar, Through CIML, Engaged In Multiple Conflicts of Interest and Reaped Prohibited Profit From The Plans**

42.    CIML was a wholly-owned subsidiary of Caterpillar.

43.    Caterpillar established CIML as a for-profit entity primarily to manage the assets of the Plans.

44.    CIML was the investment advisor of the Preferred Group of Mutual Funds (the "PGMF").

45.    Upon CIML & PGMF's establishment, their assets under management were virtually exclusively Plan assets.

46.    Caterpillar's various retirement plans, including the Plans, accounted for more than 70% of the dollars invested in the PGMF's retail mutual funds throughout CIML and PGMF's existence.

47.     CIML operated the PGMF to sell retail mutual funds to the Plans *for a profit* which ultimately was paid over to CIML's parent company, Caterpillar.

48.     In 2006 Caterpillar profitably sold PGMF to T. Rowe Price.

49.     Caterpillar had used Caterpillar employees' retirement assets, including Plan assets, as seed money to establish CIML and the PGMF.  This not only enabled them to profit from the Plans, but also to market the PGMF to others and to profit from them as well.  At all times, including the time of this sale, the vast majority of PGMF's assets under management were assets of the Plans.

50.     Nonetheless, Caterpillar failed and refused to recognize this and allow the Plans to participate in the proceeds derived from its assets in this sale.

51.     In short, while Caterpillar used its employees' retirement assets, including Plan assets, as seed money to establish a mutual fund company which it thereafter operated and sold the mutual fund family for a profit, Caterpillar and the other Defendants allowed Caterpillar to benefit from this use of Plan assets to the exclusion of the Plans.

52.     By this conduct, Defendants violated the Plan documents, breached their fiduciary duties to operate the Plans for the exclusive benefit of Plan participants, engaged in conflicts of interest and prohibited transactions, caused damages to the Plans, and are liable to the Plans for equitable relief including, but not limited to, an accounting, restitution and disgorgement.

**For the Benefit of Caterpillar And At the Expense of The Plan, Defendants Included Almost Exclusively CIML's Imprudent, *Actively-Managed Retail* Mutual Funds When Superior *Wholesale* Investment Options, Including Passively-Managed Investment Options, Were Readily Available**

53.     The *wholesale* investment market available to institutional investors and large 401(k) plans – plans nowhere near the multi-billion dollar size of the Plans here – is very different from the *retail* mutual fund market for small, individual investors.

54.     In the "wholesale" market, private collective trusts and/or separate accounts are readily available for a quarter of the price of retail mutual funds to "jumbo" plans like those here.

55.     With private collective trusts and separate accounts, fiduciaries can hire the same managers and offer virtually the same investment vehicles while providing superior benefits.  For example, Plan fiduciaries establish and control the investment objectives of separate accounts, avoid excessive trading costs incurred by active traders, and escape the conflicts of interests and scandals that have plagued the mutual fund industry.

56.     Such wholesale collective trusts and separately managed accounts were readily available to the Plan at a fraction of the cost of CIML's PGMF retail mutual funds.

57.     When compared to those available in the wholesale investment market, the fees that CIML assessed against Plan investment options via the PGMF retail mutual funds were excessive across the board.

58.     As indicated in BFC meeting minutes recently received from Defendants: (a) Caterpillar was aware that the Plans' investment management fees, paid by participants, were high due to the mutual fund structure; and (b) that the peer universe of the Plans typically used separate institutional accounts and passive investing.  Despite this, Defendants retained such excessively-priced mutual funds and funneled the revenues and profits from doing so to Caterpillar.

59.     Laboring under serious conflicts of interest, Defendants caused the Plans to forego the benefits of the wholesale investment market so that CIML could collect unreasonable and excessive fees which, in turn, would create revenues and profits for the benefit of Caterpillar.

60.     After Caterpillar sold the PGMFs to T. Rowe Price, Defendants changed the Plans' investment options from CIML-managed mutual funds to separate accounts.  In short,

once Caterpillar no longer had a profit interest in subjecting the Plan to CIML's mutual funds, it no longer required Plan assets to be held in such funds.

61.     By this conduct, Defendants violated the Plan documents, breached their fiduciary duties, engaged in conflicts of interest and prohibited transactions, caused damages to the Plans, and are liable to the Plans for equitable relief including, but not limited to, an accounting, restitution and disgorgement.

**Defendants Profited From Or Disregarded The Benefits Of Additional Compensation Streams At The Expense Of The Plans**

62.     Beyond collecting fees from the Plans, Plan service providers collect additional, undisclosed compensation from their dealings with the Plans and Plan assets ("Additional Compensation Streams").  For example:

- CIML and the PGMF received soft dollars from brokerage commission recapture programs from its retail mutual funds in connection with the Plan assets;

- Trustees or custodial banks perform cash sweeps of Plan accounts to capture cash before it is transferred to investment options, and earn interest on those cash holdings;

- Trustees retain earnings on univested cash "float" as part of their compensation, allowing them to receive potentially uncapped compensation;

- Record keepers, consultants, investment managers, and investment advisors received soft dollars from brokerage commission recapture programs; and

- Investment managers, custodial banks, prime bankers, and/or mutual funds receive payments for lending securities, owned by the Plans, to third parties.

63.     Based on BFC committee meeting minutes recently produced, Plaintiffs are informed and believe Defendants either, at various points in time, (1) used Plan assets as part of

a securities lending program but funneled the proceeds to Caterpillar; or (2) excluded the Plan from participating in a successful securities lending program in which other Caterpillar corporate and/or retirement assets participated. Either way, Defendants' conduct caused the Plan to loose revenue it otherwise would have received.

64.     In a multi-billion dollar plan, like the Plans here, such Additional Compensation Streams can result in millions of dollars of funds available to the Plans to reduce other expenses or enhance returns.

65.     Accordingly, Plan fiduciaries must also understand and consider these Additional Compensation Streams in fulfilling their fiduciary obligations to ensure that the compensation that service providers receive is reasonable in light of the services provided, that the Plans receive the full benefit of revenue streams generated in connection with Plan assets, that Plan fees and expenses are incurred solely for the benefit of the Plans and Plan participants and beneficiaries, and are free of conflicts of interest and prohibited transactions.

66.     Here, Defendants have failed to do so.

67.     In addition, and in the alternatives, by including exclusively retail mutual funds rather than appropriate collective trust and/or separately-managed accounts, Defendants rendered themselves incapable of negotiating directly with Plan investment managers, record keepers, trustees and others to secure for the benefit of the Plan the proceeds and profits available to the Plans, due to their size, from Additional Compensation Streams.

68.     Engaging in additional serious conflicts of interest and prohibited transactions, Defendants caused CIML to control such additional compensation streams and retain the revenue from them which, in turn, it paid over for the benefit and profit of Caterpillar and to the detriment of the Plan.

69.     By this conduct, Defendants violated the Plan documents, breached their fiduciary duties, engaged in conflicts of interest and prohibited transactions, caused damages to the Plans, and are liable to the Plans for equitable relief including, but not limited to, an accounting, restitution and disgorgement.

**Payment for Active Investment Management And Imprudent Investments**

70.     As set forth above, all but two of the Plan's investment options were actively-managed retail mutual funds.

71.     In actively-managed funds, investment managers purchase and sell securities in an effort to outperform the Fund's benchmark.  Active management is more expensive than passive management, in which Fund managers conform their holdings to those of a particular benchmark.

72.     Nobel Prize winning economists and many other prominent authors have concluded that that actively managed funds rarely outperform passively managed funds on a risk-adjusted basis when held as long-term investments.

73.     Defendants had no prudent fiduciary process to prudently consider, and did not prudently consider, whether the active management of the Plans' many retail mutual funds provided benefits to the Plans that outweighed their additional costs on a longer-term, risk-adjusted basis.

74.     CIML charged higher fees for active investment management than could any passive investment manager, which inured to the benefit of Caterpillar.

75.     Defendants included high priced actively-managed retail mutual funds without considering low-cost index funds so as to serve the interests of Caterpillar to the detriment of the Plans and their participants and beneficiaries.

76.     Including CIML's actively-managed retail mutual funds as investment options in the Plans without a prudent process to determine whether their benefits justified them, caused participants and beneficiaries to receive less than a market return on their long-term retirement savings while paying excessive fees to CIML for the benefit of Caterpillar.

77.     By this conduct, Defendants violated the Plan documents, breached fiduciary duties, engaged in conflicts of interest and prohibited transactions, caused damages to the Plans, and are liable to the Plans for equitable relief including, but not limited to, an accounting, restitution and disgorgement.

78.     Defendants caused the Plans to pay for active investment management, provided by CIML to profit Caterpillar, without prudent and proper fiduciary consideration of whether such active management would outperform passive management on a long-term, risk-and fee-adjusted basis.

79.     Defendants further subjected the Plans to the excessive trading cost incurred by active traders, conflicts of interest and scandals that plague the retail mutual funds industry.

80.     In addition, the specific investment options selected were imprudent in that their actual and expected performance was unreasonably poor when compared to appropriate benchmarks, including the performance of similar passive investment options.

### "Shadow" Index Funds Charging the Plan For Active Management

81.     The Plans pay extremely high active management fees to CIML.

82.     Despite paying the higher costs for active management, several of the Plans' CIML/PGMF retail mutual funds are structured and behave like index funds.  These are "Shadow Index Funds."

83.     The managers of the Plans' Shadow Index Funds seek to achieve returns similar to those of their benchmark/index by effectively replicating its holdings.  Such Shadow Index Fund managers do this by including investments that substantially replicate, by, for example, mirroring the index's weighing of types of stocks, industry sectors or geography.  While simply replicating the index by what is essentially passive management, such Shadow Index managers charge higher active management fees.

84.     In each of the Plans' Shadow Index Funds, ninety-five (95%) percent or more of the variation in the Fund's investment gains and losses is correlated statistically to such variations in the respective benchmark/index against which the Fund measures its performance.

85.     In short, while the performance of such Shadow or Closet Index Funds mirrors that of its benchmark/index, Fund managers charge for active management, resulting in lower performance after fees than is available in the passive indexes which they mirror.

86.     By structuring and operating the Plans' CIML/PGMF retail mutual funds as Shadow Index Funds, CIML charged the Plan unreasonable fees for the services provided and paid over the revenues and profits generated from those excessive fees for the benefit of Caterpillar and to the detriment of the Plan and its participants and beneficiaries.

87.     By this conduct, Defendants violated the Plan documents, breached their fiduciary duties, engaged in conflicts of interest and prohibited transactions, caused damages to the Plans, and are liable to the Plans for equitable relief including, but not limited to, an accounting, restitution and disgorgement.

### Cash Holdings in the Caterpillar Stock Fund

88.     Through the Plans' Caterpillar Stock Fund, participants can invest their retirement savings in Caterpillar Stock.

89.     The Caterpillar Stock Fund, as a retirement savings vehicle, is intended for long-term investing.  There is no need for it to hold substantial amounts of cash.

90.     The Caterpillar Stock Fund's cash holdings reduce the Fund's return because the value of the cash remains static.

91.     Defendants breached their fiduciary duties by: (A) maintaining and holding, causing to be maintained or held, or allowing to be maintained or held, excess cash in the Caterpillar Stock Funds and thereby impairing participants' returns; (B) obscuring, and/or misleading participants about, these facts.

92.     Defendants otherwise improperly managed the Company Stock Fund by causing it to maintain a cash buffer when alternatives were available that did not cause such detrimental effects.

93.     As indicated in BFC meeting minutes recently produced by Defendants, Caterpillar and the BFC's management of the Caterpillar Stock Fund constituted a conflict of interest under ERISA and other applicable law.

**Defendants' Campaign of Misrepresentation and Concealment**

94.     Defendants falsely stated that Caterpillar paid the Plans' administrative fees and costs when, in actuality, Caterpillar knew that participants paid such fees and costs to CIML so as to generate profits for Caterpillar.

95.     As a result of such false statements, Defendants caused the Plan damages in the amount of such fees paid over to CIML for the benefit of Caterpillar.

96.     Defendants intentionally and falsely stated to Plan participants that the retail mutual fund fees they paid were appropriate and in the best interest of the Plan when, in truth: (1) the lower fees available in the wholesale investment marketplace were appropriate and in the best interest of the Plans; and (2) Defendants ignored the benefits available to the Plan and its

participants and beneficiaries available in the wholesale marketplace so as to allow CIML to sell retail mutual funds to the Plan and generate revenues and profits for Caterpillar.

97.    In addition, Defendants have not disclosed, and/or have affirmatively concealed, a litany of material information including:

A.    That they had used participants' retirement savings as seed money to establish a for-profit company, CIML, which – in clear breach of their fiduciary obligations – reaped excess and prohibited profits from Plans via their retail mutual funds;

B.    That, at all times, the vast majority of CIML's assets under management were the savings of Plan participants, such that CIML based its very existence on the retirement savings of participants and could not survive as a going concern without virtually exclusive reliance on those retirement savings;

C.    That, in light of the foregoing, all the profits and revenues CIML generated and paid to Caterpillar were derived from Plan assets;

D.    That Caterpillar profitably sold PGMF as a going concern and for a profit, and that such going concern value and profit was based upon Plan assets and CIML's establishment with exclusive assets from the participants retirement savings;

E.    That comparable or identically managed investment vehicles were available to the Plans in the wholesale investment marketplace for a fraction of the cost;

F.     That CIML, and thus Caterpillar, profited by ignoring this wholesale marketplace and including CIML/PGMF retail mutual funds through which they could charge higher retail fees;

G.     That by including retail/publicly-traded mutual funds as Plan investment options, Defendants squandered the Plans' enormous bargaining power and left participants of multi-billion dollar retirement plans in the same circumstances as small, retail investors;

H.     That while paying for active management, participants were receiving poor returns that could be outdone by passively managed index funds while the revenues and profits from such excessive active management fees were paid to Caterpillar for its benefit and the detriment of the Plans;

I.      That while charging for active investment management in CIML's actively-managed retail mutual funds, participants received Shadow Index Funds; while CIML, and thus Caterpillar profited from these excessive fees to the detriment of the Plans and their participants and beneficiaries;

J.      That the cash in the Caterpillar Stock Fund is unnecessary, excessive and undermines participants' returns;

K.     That the excessive fees, as set forth above, assessed against participants' accounts, substantially undermine the value of participants' retirement savings over time;

L.     That Plan service providers were and/or are receiving excess payments via Additional Compensation Streams, and that such monies were available for the benefit of the Plans but not captured for the Plans; and

M.     That, in light of the foregoing, Defendants labored under serious conflicts of interest and engaged in multiple prohibited transactions such that they were incapable of operating and administering the Plans in the sole interest of participants and beneficiaries.

98.     Because the Defendants failed and refused to provide them with this information, and concealed this information from them, Plan participants and beneficiaries have lacked the information necessary for them: (a) to understand and protect their interests in the Plans; (b) to have knowledge regarding the Defendants' breaches of fiduciary duty; and (c) to have reason to believe they should make inquiry about those breaches and the facts underlying them.

## COUNT I:

### [Breach of Fiduciary Duty – Violation of Plan Documents]

99.     Plaintiffs restate and incorporate the allegations contained in ¶¶ 1 through 98 as though fully set forth herein.

100.     Defendants are bound by a fiduciary duty to administer the Plans in accordance with the Plan documents, including but not limited to the Investment Policy Statement, which requires among many things:

A.     That Defendants consider many different types of investment vehicles, including mutual fund, commingled funds, and separately managed accounts;

B.     That Defendants annually review the fees charged by existing investment options and whether they are proper in light of other available investment vehicles;

C.     That the Defendants closely monitor the investment options of the Plan.

101.     Defendants violated their fiduciary duty to administer the Plans in accordance with the Plan documents, including but not limited to the Investment Policy Statement, in that they, among other conduct to be developed in discovery and proven at trial:

> A.     Almost exclusively retained mutual funds as investment options, and BFC Meeting Minutes recently produced indicate that Defendants did not consider other investment vehicles such as separately managed accounts and commingled funds;
>
> B.     Failed to annually review the fees charged by the Plans' investment options;
>
> C.     Failed to monitor the Plans' investment options, but, as indicated in the BFC Meeting Minutes recently produced, instead disregarded the mutual fund structure and controlled the operation of the PGMF by, for example, determining the sub-advisors that CIML would retain in its purportedly-separate mutual funds.  By doing so, Defendants managed Plan assets as they would in low-priced separate accounts (*i.e.* by directly selecting investment managers) but continued to cause the Plan to pay excessive mutual fund fees to CIML for the benefit of Caterpillar.

102.     By this conduct, Defendants violated the Plan documents, breached their fiduciary duties to operate the Plans for the exclusive benefit of Plan participants, engaged in conflicts of interest and prohibited transactions, caused damages to the Plans, and are liable to the Plans for equitable relief including, but not limited to, an accounting, restitution and disgorgement.

103.     In the alternative and in addition to the foregoing, to the extent that CIML is deemed not to be a fiduciary of the Plans, as a non-fiduciary, CIML unlawfully received plan

assets as a party in interest and may be held liable because of their actual or constructive knowledge of the circumstances that created the unlawful transfer.

## COUNT II

### [Breach of Fiduciary Duty – ERISA §502(a)(2)]

104.    Plaintiffs restate and incorporate the allegations contained in ¶¶ 1 through 103 as though fully set forth herein.

105.    Further, Plaintiffs restate and incorporate the statement of Defendants' fiduciary breaches set forth in ¶ 21.B.i-xxiv.

106.    As set forth in detail above, Defendants owe to the Plans, its participants and beneficiaries, and the Class extensive fiduciary duties including, without limitation:

A.    Administer the Plans in accordance with the Plan documents, including but not limited to the Investment Policy Statement;

B.    To conduct itself as Plan Sponsor and Administrator with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent ERISA professional fiduciary would in operating and administering a 401(k) plan the size and character of the Plans;

C.    To perform its duties as Plan Sponsor and Administrator with the utmost loyalty and fidelity to the Plans and its participants and beneficiaries, avoiding at all times conflicts of interest, self-interest, prohibited transactions and duplicity;

D.    To ensure, at all times, that Plan assets "shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan[s];"

E.     To properly and prudently select investment alternatives for the Plans;

F.     To ensure, at all times, that the Plans avoid prohibited transactions;

G.     To know and understand the fees and expenses charged to the Plans, and whether they were or are unreasonable or excessive;

H.     To track and account for all transactions involving the Plans and Plan assets so as to ensure that Plan assets are retained, managed, and disbursed in compliance with the documents governing the Plans and ERISA;

I.     To track and account for all transactions involving the Plans and Plan assets so as to ensure that Plan assets "never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan[s];"

J.     To ensure that the fees and expenses incurred by the Plans are reasonable and incurred for the sole and exclusive benefit of Plan participants and beneficiaries;

K.     To know and understand additional compensation streams available due to the size of the plan, such as float, recaptured brokerage commissions and available profit from securities lending, to offset the fees charged by other service providers, as required by DOL regulations;

L.     In entering into agreements with service providers to the Plans, to ensure that the payments from the Plans — whether they are direct or indirect — are reasonable for the services provided and made for the sole and exclusive benefit of Plan participants and beneficiaries;

M.      In operating and administering the Plans, to establish, implement, and follow procedures to properly and prudently determine whether the fees and expenses paid by the Plans were reasonable and incurred solely for the benefit of Plan participants;

N.      To inform itself of, and understand, the various methods by which vendors in the 401(k) industry collect payments and other revenues from 401(k) plans;

O.      To inform itself of trends, developments, practices, and policies in the retirement, financial investment and securities industry which affect the Plans; and to remain aware and knowledgeable of such trends, practices and policies on an ongoing basis;

P.      To communicate with Plan participants and beneficiaries regarding the Plans honestly, clearly and accurately;

Q.      To affirmatively and without request provide Plan participants and beneficiaries with honest, accurate and complete information they need to understand their investments in the Plans; the management, risk, potential returns of such investments; and the fees and expenses incurred in connection with those investments; and

R.      To provide honest, accurate and complete information to Plan participants and beneficiaries regarding the costs associated with their various investment choices and directions.

107.    As set forth in detail above, Defendants failed to abide by the governing Plan documents and otherwise breached their fiduciary obligations to the Plans, Plan participants and beneficiaries and the Class by, among other conduct to be proven at trial:

A.    Establishing and operating a for-profit subsidiary through the use of participants retirement savings, thereby making a profit from these assets and failing to operate the Plans for the sole benefit of Plan participants;

B.    Failing to secure, for the benefit of the Plans, all proceeds arising from the use of participants' assets, including the profits of CIML and the proceeds from the sale of PGMF and instead funneling those proceeds to Caterpillar;

C.    Shifting Caterpillar's obligation to pay the Plans' administrative expenses to the Plans and its participants and beneficiaries through hidden arrangements;

D.    Causing the Plan, and its participants and beneficiaries, to pay excessive and unreasonable fees to CIML, a wholly-owned Caterpillar for-profit subsidiary;

E.    Choosing, and including as Plan investment options, Shadow Index Funds offered by CIML and, by doing so, generating excessive fees which were funneled to Caterpillar;

F.    Causing and/or allowing the Caterpillar Stock Fund to hold cash so as to impair participants' returns;

G.    Squandering the Plans' enormous bargaining power to obtain low-cost investment options, and instead subjecting the Plans and their participants

33

and beneficiaries to high-priced retail mutual funds and, by doing so, generating additional revenues and profits which were funneled to Caterpillar;

H.   Failing to employ the Plans' enormous bargaining power to obtain separate accounts and/or other low-cost investment options that provide a market return and are appropriate for a multi-billion dollar 401(k) plan and, by doing so, creating additional profits and revenues which were funneled to Caterpillar;

I.   Failing to properly and prudently select Plan investment options, making selections for self-interested reasons, and/or abdicating their responsibilities in this regard;

J.   Causing the Plans to pay fees including fees for recordkeeping charges by the Plan's recordkeeper Hewitt Associates and expenses that were, and continue to be, unreasonable and/or not incurred solely for the benefit of Plan participants and beneficiaries but inure to the benefit, through CIML, of Caterpillar;

K.   Failing to engage in an appropriate process to periodically assess the reasonableness of fees charged by the Plan's administrative service providers including but not limited to Hewitt;

L.   Engaging in self-interested and prohibited transactions;

M.   Failing to monitor the fees and expenses paid by the Plans and, by such failure, causing and/or allowing the Plans to pay fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of

Plans participants and beneficiaries and funneling the proceeds of such to Caterpillar;

N.   Failing to know and understand the fees and expenses charged to the Plans, and whether they were or are unreasonable or excessive;

O.   Failing to inform themselves of trends, developments, practices, and policies in the retirement, financial investment and securities industry which affect the Plans; and failing to remain aware and knowledgeable of such trends, practices and policies on an ongoing basis;

P.   Failing to inform themselves of, and understand, the various methods by which vendors in the 401(k) industry collect payments and other revenues from 401(k) plans;

Q.   Failing to establish, implement, and follow procedures to properly and prudently determine whether the fees and expenses paid by the Plans were reasonable and incurred solely for the benefit of Plan participants;

R.   Failing to communicate with Plan participants and beneficiaries regarding the Plans honestly, clearly and accurately;

S.   Concealing material information about the Plans and Plan administration and costs from Plan participants and beneficiaries and, by doing so, hiding from participants that Defendants were using CIML as a conduit of revenues and profits to Caterpillar;

T.   Selecting numerous high-priced CIML retail mutual funds as Plan investment options, and thereby breaching their fiduciary duty to select

reasonable and prudent investment choices for the Plans and, in doing so, creating revenues and profits for Caterpillar at the expense of the Plan;

U.    Failing to know and understand additional compensation streams available due to the size of the plan, such as float, recaptured brokerage commissions and available profit from securities lending, to offset the fees charged by other service providers, as required by DOL regulations;

V.    Allowing Plan service providers, at the Plans' expense, to receive Additional Compensation Streams; and failing to capture Additional Compensation Streams such as float, recaptured brokerage commissions and available profit from securities lending for the benefit of the Plans and Plan participants;

W.    Using Plan assets to generate securities lending proceeds from which Caterpillar profited and/or excluding the Plans from a profitable securities lending program;

X.    Failing properly to inform and/or disclose to Plan participants the fees and expenses that are, or have been, paid by the Plans;

Y.    Falsely representing that Caterpillar paid Plan administrative fees when, in actuality, such fees were removed from Participants' accounts;

Z.    Failing to disclose to Plan participants and beneficiaries that the Plans' investment options subjected their retirement savings to excessive and unreasonable fees in light of the Plans' size and bargaining power in the investment marketplace and that the proceeds from those excessive fees inured to Caterpillars benefit;

AA.   Failing to disclose to Plan participants and beneficiaries that defendants had chosen plan investment options without considering appropriate information and investment alternatives in light of the Plans' size and asset value; and

BB.   Failing to disclose information regarding the Plans' fees and expenses that was required by ERISA, by ERISA's fiduciary duties, or was necessary under the circumstances for participants to make informed investment decisions.

108.   By this conduct, Defendants violated the Plan documents, breached their fiduciary duties to operate the Plans for the exclusive benefit of Plan participants, engaged in conflicts of interest and prohibited transactions, caused damages to the Plans, and are liable to the Plans for equitable relief including, but not limited to, an accounting, restitution and disgorgement.

109.   In the alternative and in addition to the foregoing, to the extent that CIML is deemed not to be a fiduciary of the Plans, as a non-fiduciary, CIML unlawfully received plan assets as a party in interest and may be held liable because of their actual or constructive knowledge of the circumstances that created the unlawful transfer.

110.   As set forth in detail above, as a result of these breaches, the Plans, Plaintiffs, the Class, and the Plans' participants and beneficiaries have suffered financial losses and damages.

111.   Pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(a), 29 U.S.C. §1132(a) Defendants are personally liable to make good to the Plans for the losses it experienced as a result of Defendants' breaches of fiduciary duty.

112.     Pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(a), 29 U.S.C. §1132(a) Defendants are personally liable for any other available and appropriate equitable relief, including prospective injunctive relief and declaratory relief, and attorney's fees.

## COUNT III:
### [Other Remedies for Breach of Fiduciary Duty – ERISA §502(a)(3)]

113.     Plaintiffs restate and incorporate the allegations contained in ¶¶ 1 through 112 as though fully set forth here.

114.     Further, Plaintiffs restate and incorporate the statement of Defendants' fiduciary breaches as set forth in ¶ 21.B.i-xxiv.

115.     In addition to, and as an alternative to, the causes of action stated in Counts I and II, Plaintiffs seek further relief pursuant to ERISA § 502(a)(3), 29 U.S.C., § 1132(a)(3).

116.     Under ERISA §502(a)(3), a participant may enjoin any act which violates ERISA or may obtain other appropriate equitable relief to redress such violations or enforce the terms of ERISA.

117.     Defendants are the primary fiduciaries of the Plans and occupy a position of trust and confidence in connection with the Plans, the Plans' assets, and the Plans' participants and beneficiaries.

118.     Defendants have exclusive discretion and control over the Plans' assets and are strictly obligated to exercise that control "for the exclusive purposes of providing benefits to participants in the Plan[s] and their beneficiaries and defraying reasonable expenses of administering the Plan[s]."

119.     By accepting possession and control over Plan participants' assets, Defendants necessarily have also accepted the obligation to explain and account for every transaction, expenditure, application and distribution of such assets.

120.     Although *only* Plan participants and beneficiaries are entitled to Plan assets and to the benefit of Plan assets, in the absence of full and candid disclosure from Defendants, Plan participants and beneficiaries do not know, and have no means of knowing, how their assets have been managed and disbursed.

121.     Accordingly, Defendants occupy the position like that of a common law trustee in connection with the Plans, Plan assets, and Plan participants and beneficiaries.

122.     As set forth in detail above, Defendants have caused the Plans to pay excess fees and expenses to CIML and, in doing so, funneled revenues and profits to Caterpillar.  Further, Defendants have engaged in self-interested transactions and used Plan assets to establish, operate, and sell a for-profit business.  Litigating and resolving these issues will involve identifying and reconciling multiple transfers, payments, and flows of Plan assets that occurred while such Plan assets were within Defendants possession and control.

123.     Defendants, and not the Plaintiffs, are the entities which have and/or should have specific and detailed information regarding how Plan assets have been treated and disbursed in this regard.

124.     An accounting is a particularly appropriate equitable remedy in circumstances where, as here, the underlying action and accounts are so complicated that a normal action for a fixed sum may not be practical.

125.     In such an accounting, in light of their possession and control of Plan assets and information about how Plan assets have been used, applied, and distributed, Defendants must bear the burden of proving all Plan transactions and their propriety.

126.     Accordingly, the Court should order that Defendants render an accounting of all profit transactions, disbursements and dispositions occurring in, in connection with, and/or in respect of the Plan and its assets.

127.     Plaintiffs respectfully request that the Court order that such an accounting include, without limitation, detailed and specific information regarding: (a) all fees and expenses incurred by the Plans and/or paid to third parties, whether paid directly by the Plans or indirectly transferred among Plan service providers or other third parties; (b) all revenues and profits of Caterpillar, CIML and/or related entities received in respect of Plan assets; and all revenue streams generated in respect of the Plan.

128.     Plaintiffs respectfully request that the Court charge/surcharge against the Defendants and in favor of the Plans all amounts involved in transactions which such accounting reveals were or are improper, excessive and/or in violation of ERISA.

129.     Plaintiffs respectfully request that the Court order Defendants to disgorge all: (a) amounts credited to Caterpillar for administrative costs which Caterpillar was obligated to pay and which Defendants assured Plan participants it did pay; and (b) all profits Caterpillar, CIML, and/or related entities received in respect of Plan assets.

130.     Plaintiffs further seek injunctive and other appropriate equitable relief to redress the wrongs described above and to cause them to cease so that the Plans' participants and beneficiaries receive the full benefit of their retirement savings in the future.

131.     In the alternative and in addition to the foregoing, to the extent that CIML is deemed not to be a fiduciary of the Plans, as a non-fiduciary, CIML unlawfully received plan assets as a party in interest and may be held liable because of their actual or constructive knowledge of the circumstances that created the unlawful transfer.

**Count IV:**
**[Negligent Spoliation of Evidence—Under Illinois Common Law]**

132.    Plaintiffs restate and incorporate the allegations contained in ¶¶ 1 through 131 as though fully set forth herein.

133.    On September 11, 2006, Plaintiffs filed their initial Complaint in this action naming Caterpillar, the BFC and CIML as Defendants.

134.    Service of the Summons and Complaint was executed on Defendants Caterpillar, the BFC and CIML and was returned on September 13, 2006.

135.    Pursuant to the service of the Summons and Complaint in this action and continuing to this date, Defendants have owed a duty to the Plaintiffs, the Class and the Plans to take all reasonable and necessary steps to ensure the preservation of evidence, including existing documents, relevant to the Plaintiffs' claims in this case.

136.    Plaintiffs filed and served on Defendants Caterpillar, the BFC and CIML an Amended Complaint on May 25, 2007.

137.    Plaintiffs filed and served on Defendants Caterpillar, the BFC and CIML a Second Amended Complaint on July 5, 2007.

138.    Each of the successive Complaints in this case, including the Second Amended Complaint, has included various claims for breaches of fiduciary duties related to Caterpillar's wholly-owned subsidiary, Defendant CIML and the Funds for which CIML provided investment management and advisory services to the Plans.

139.    On May 14, 2008, in a Motion to Stay proceedings in this case, counsel for Defendants represented to this Court: "Pursuant to Rule 26, defendants have taken numerous steps to preserve materials relevant to this case, *so there is no danger of spoliation of relevant evidence due to the passage of time[.]*"  (emphasis added).

41

140.     Despite the assurance of Defendants' counsel, during the months of June and/or July of 2008, Plaintiffs have recently been informed that Defendant CIML destroyed 117 boxes, or between 200,000 and 300,000 pages, of documents relevant to claims in this case.

141.     Defendants controlled, through its agents, the documents of Defendant CIML that were destroyed.

142.     Defendants breached their duty of care to the Plaintiffs, the Class and the Plans to preserve relevant evidence in this case by negligently or intentionally destroying such documents and/or failing to adequately clearly preserve these documents.

143.     In the alternative, Defendants breached their duty of care to the Plaintiffs, the Class and the Plans to preserve relevant evidence in this case by negligently or intentionally entrusting such destroyed documents to agents whom Defendants should have foreseen might fail to preserve such documents.

144.     Plaintiffs and the Plans have suffered a present injury and damages due to the destruction of the CIML documents in that it will hamper Plaintiffs in seeking to prove their case.  The extent of the injury from the massive destruction of documents cannot presently be determined.

145.     But for the destruction of documents proximately caused by Defendants' negligence, Plaintiffs ability to prove their case with these documents would not be undermined.

WHEREFORE Plaintiffs, on behalf of the Plans and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- find and declare that the Defendants have violated Plan documents and breached their fiduciary duties as described above;

- find and adjudge that Defendants are personally liable to make good to the Plans all losses that the Plans incurred as a result of the conduct described above and to restore the Plans to the position the Plans would have been in but for the breaches of fiduciary duty;

- find and adjudge that, to the extent that CIML is not a Plan fiduciary, CIML has unlawfully received Plan assets and is liable because it had actual or constructive knowledge of the circumstances that created the unlawful transfer.

- award actual monetary losses to the Plans;

- impose a constructive trust on any monies by which the Defendants were unjustly enriched as a result of their breaches of fiduciary duty and spoliation of evidence and cause the Defendants to disgorge such monies and return them to the Plans;

- remove the fiduciaries who have breached their fiduciary duties and/or engaged in spoliation of evidence and/or enjoin them from future breaches of ERISA;

- require Defendants to render an accounting as set forth above;

- surcharge against Defendants and in favor of the Plans all amounts involved in transactions which such accounting reveals were or are improper, excessive and/or in violation of ERISA;

- permanently enjoin Defendants from breaching their fiduciary duties in each respect set forth in the Complaint;

- award to the Plaintiffs and the Class their attorneys fees and costs pursuant to ERISA § 502(g);

- order costs and attorneys fees pursuant to ERISA § 502(g) and the common fund doctrine;

- order equitable restitution or other available equitable relief against the Defendants;

- order the payment of interest to the extent it is allowed by law;

- find and declare that the Defendants negligently and/or intentionally destroyed documents relevant to this case;

- find and declare that the Defendants have breached their duty of care to the Plaintiffs, the Class and the Plans by failing to prevent the spoliation of evidence relevant and that Plaintiffs and the Plans have thereby suffered damages as the proximate cause of Defendants' negligence;

- infer that the documents destroyed would have furthered the proof of Plaintiffs' causes of action and undermined Defendants' defenses;

- strike Defendants' pleadings and defenses;

- find and adjudge that Defendants are jointly and severally liable to the Plaintiffs and the Plans for damages suffered by them due to Defendants' negligent or intentional failure to prevent the spoliation of evidence related to claims involving CIML; and

- grant any other and further relief the Court deems appropriate.

Respectfully Submitted,

SCHLICHTER, BOGARD & DENTON


By: /s/ Jerome J. Schlichter
     Jerome J. Schlichter
     Daniel V. Conlisk

     Mark G. Boyko
     Heather Lea
     100 S. Fourth St., Suite 900
     St. Louis, Missouri 63102
     (314) 621-6115
     (314) 621-7151 (Fax)
     dconlisk@uselaws.com
     hlea@uselaws.com
     120 West Main Street, Ste. 208
     Belleville, IL 62220

     Michael Waters
     Local Counsel
     Vonachen, Lawless, Trager & Slevin
     456 Fulton Street, Ste. 425
     Peoria, Illinois 61602
     (309) 676-8986
     (309) 676-4130 (Fax)

     ATTORNEYS FOR PLAINTIFFS/
     CLASS REPRESENTATIVES
     Steve Martin, Carol Tegard, and Allen Rose

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 11, 2010, I served this THIRD AMENDED COMPLAINT FOR BREACH OF FIDUCIARY DUTY for with the Clerk of the Court using the CM/ECF system which will send notification of such filing(s) to the following:

Mark Casciari
Ian Morrison
Seyfarth Shaw, LLP
131 South Dearborn Street, Ste. 2400
Chicago, IL 60603
(312) 460-5000
mcasciari@seyfarth.com


Timothy L. Bertschy
HEYL, ROYSTER, VOELKER & ALLEN
Chase Building
124 SW Adams Street, Suite 600
Peoria, IL 61602-1352
Tel: (309) 676-0400
Fax: (309) 676-3374
tbertschy@hrva.com

s/ Jerome J. Schlichter
_____